**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**CIVIL ACTION NO. 5:15-CV-00096-RLV-DSC**

| | | |
|---|---|---|
| LARRY CLINE, | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **ORDER** |
| | ) | |
| AETNA LIFE INSURANCE COMPANY, | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

  **THIS MATTER IS BEFORE THE COURT** on cross motions for summary judgment, each supported by an accompanying brief. Each party responded to the other's motion, and replied to the other's response. These cross-motions are thus ripe for consideration.

**I. PROCEDURAL HISTORY**

  On July 28, 2015, Plaintiff filed suit against Defendant in this Court. [Doc. 1]. On September 28, 2015, Defendant filed an Answer to Plaintiff's Complaint. [Doc. 4]. On April 5, 2016, Plaintiff filed its motion for summary judgment ("Plaintiff's Motion") and an accompanying brief in support. [Doc. 8, 9]. On the same day, Defendant filed its motion for summary judgment ("Defendant's Motion") and an accompanying brief in support. [Doc. 11, 11-1]. On April 22, 2016, Plaintiff filed a response in opposition to Defendant's Motion. [Doc. 12]. On the same day, Defendant filed a response in opposition to Plaintiff's Motion. [Doc. 13]. On May 2, 2016, Defendant filed a reply brief in support of Defendant's Motion. [Doc. 14]. On the same day, Plaintiff filed a reply brief in support of Plaintiff's Motion. [Doc. 15].

## II.     JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), and in particular 29 U.S.C. § 1132(e) and 1132(f) contained therein, which give District Courts jurisdiction to hear civil actions involving benefit claims arising under Employment Welfare Plans such as the one at issue in this action. 28 U.S.C. § 1331 gives District Courts jurisdiction to hear cases involving actions arising under the laws of the United States.

Plaintiff is a citizen and resident of Lincoln County, North Carolina, and was employed full-time by Netjets, Inc. ("Netjets") as a commercial pilot. [Doc. 1] at 1–2. Defendant is the claims administrator for the Netjects's Long-Term Disability Plan (the "Plan"), and also insures the benefits under the Plan. [Doc. 1] at 1–2; [Doc. 4] at 1. Venue in the Western District of North Carolina, Statesville Division, is appropriate by virtue of Plaintiff's residence and Defendant's presence and doing business in this district.

## III.     STATEMENT OF FACTS

At all times relevant to this action, Plaintiff has been a covered beneficiary under the Netjets, Inc. Long-Term Disability Plan (the "Plan"), which provides group long-term disability ("LTD") benefits to eligible employees. [Doc. 1] at 2; [Doc. 4] at 2.

The Plan provides LTD benefits when a claimant meets the "test of disability," which is defined as:

**Test of Disability**
From the date that you first become disabled and until Monthly Benefits are payable for 24 months, you will be deemed to be disabled on any day if:

- you are not able to perform the **material duties** of your **own occupation** solely because of: disease or **injury**; and
- your work earnings are 80% or less of your adjusted predisability earnings.

. . . .

If your **own occupation** requires a professional or occupational license or certification of any kind, you will not be deemed to be disabled **solely** because of the loss of that license or certification.

Record (AR 7010004)

The Plan defines "Material Duties" as duties that:

- are normally required for the performance of your **own occupation**; and
- cannot be reasonably: omitted or modified. However, to be at work in excess of 40 hours per week is not a material duty.

Record (AR 7010017)

The Plan defines "Own Occupation" as:

This is the occupation that you are routinely performing when your period of disability begins. Your occupation will be viewed as it is normally performed in the national economy instead of how it is performed:

- for your specific employer; or
- at your location or work site; and

without regard to your specific reporting relationship.

*Id.*

One of the overriding job functions for a Netjets pilot is to "[b]"e able to meet physical demands as outlined in the Physical Demands Summary of this Essential Job Functions form."

[Doc. 8-1] at 1. Among other requirements, and most relevant to Plaintiff's claim, the Physical Demands Summary lists the following tasks which a Netjets pilot must be able to perform:

**Ascending or descending ladders, stairs, scaffolding, ramps, poles and the like, using feet and legs and/or hands and arms. Body agility is emphasized.** This factor is important if the amount and kind of climbing required exceeds that required for ordinary locomotion: Climb or descend steep or narrow passageways such as stairways to aircraft; **climbing on wings,** to put engine covers on, up and down aircraft stairs.

. . . .

Balancing. Maintaining body equilibrium to prevent falling and walking, standing or crouching on narrow, slippery, or erratically moving surfaces. This factor is important if the amount of balancing exceeds that needed for ordinary locomotion and maintenance of body equilibrium.

. . . .

Crouching. **Bending the body downward and forward by bending leg and spine.**

. . . .

Standing. Particularly for sustained periods of time.

. . . .

Walking. Moving about on foot to accomplish tasks, particularly for long distances or moving from one work site to another: **Sometimes may be required to run while carrying or pulling suitcase, kitbags,** etc.

. . . .

Response to **emergency** situations. **Must be able to override jammed or manually operative flight controls;** operate and reset emergency exit handles; Ability to evacuate the airplane in an emergency from available exits effectively utilizing appropriate emergency equipment such as slides, rafts and other flotation devices; Ability to open window and evacuate cockpit via a rope in an emergency. Must be able to lift, turn and otherwise manipulate objects weighing up to 65 [pounds] during emergency procedures including emergency exit doors, and life-rafts. **Must be able to apply at a minimum the following forces:** pitch and roll (arm) control, two hands available 50–75 [pounds] of force; pitch and roll (arm) control, one hand available 25–50 [pounds] of force; **yaw (leg) control exerting 150 [pounds] of force.**

*Id.* at 1–3 (original emphasis omitted) (emphasis added).

On May 11, 2012, Plaintiff underwent decompression surgery for lumbar stenosis, which was performed under the auspices of Dr. Timothy Adamson.[1] (AR 7000064)[2]. Following Plaintiff's general recovery, he returned to work on April 26, 2013. *Id.* On November 6, 2013, Plaintiff stopped working, alleging he suffered from disability, including lumbosacral spondylosis, tarsal tunnel syndrome, and significant leg weakness, and could no longer safely and reliably perform some of the essential job functions for a Netjets pilot. [Doc. 1] at 3; [Doc. 4] at 2. Plaintiff reported that his inability to depend on leg strength and stability precluded him from performing any duty listed on the capabilities worksheet that require use of his leg. (AR 7000212). More specifically, Plaintiff reported that "his right leg has weakness and will 'give out' on him intermittently." Record (AR 7000089). At Plaintiff's November 6, 2013, appointment, Dr. Adamson recommended a right L5-S1 epidural injection, referred Plaintiff to physical therapy, and noted that "[d]ue to the type of work that Mr. Cline does, we will have him remain out of work until his next office appointment." (AR 7000271). Plaintiff underwent physical therapy from December 31, 2013 to February 24, 2014. *Id.* at AR 7000276. On February 26, 2014, Plaintiff followed-up with Dr. Adamson, who noted that "as part of his job duties [Plaintiff] does need to strengthen the lower extremities, since the right leg continues to give out from time to time we will have him remain out of work at this point." *Id.* at AR 7000268.

On or about May 5, 2014, the end of the elimination period and at least 180 days after the onset of his asserted disability, Plaintiff applied for LTD benefits. [Doc. 1] at 3; [Doc. 4] at 3. On May 24, 2014, Dr. Adamson ordered a right lower extremity electromyography ("EMG") nerve conduction study, which was performed on June 5, 2014 by Dr. John Welshofer. (AR 7000234);

---

[1] Doctors Adamson, Lesher, and Welshofer are members of Carolina Neurosurgery and Spine Associates, Charlotte, North Carolina.
[2] Exhibits in the Administration Record "AR" are found at Documents 10-1 through 10-6.

(AR 7000234). Dr. Welshofer reported that the EMG revealed "[m]ild prolongation of the conduction velocity of the peroneal nerve around the fibular head," "a mild peroneal neuropathy at the fibular head," and "mild prolongation of the [right] medial and lateral plantar mixed sensory responses suggestive of a mild [right] tarsal tunnel compressive neuropathy," but no "electrodiagnostic evidence to diagnose a lumbar radiculopathy" or "other significant electrodiagnostic abnormalities." (AR 7000237). Dr. John Lesher then ordered an ultrasound, which was performed on July 8, 2014. (AR 7000227); (AR 7000221). After reviewing the ultrasound, Dr. Lesher reported that he thought Plaintiff's symptoms are "related to chronic right S1 radiculitis given his sensory involvement affecting the lateral aspect of his foot and diminished right Achilles reflex." (AR 7000223).

On May 16, 2014, while Plaintiff underwent the evaluations described above, Defendant sent a letter to Dr. Adamson, asking him to confirm that Plaintiff was able to perform "Light Work." *Id.* at AR 7000256-7000257. The letter defined "Light Work" as:

> Light work involves lifting, carrying, pushing, or pulling 20 pounds occasionally, up to 10 pounds frequently, or negligible amount constantly. May include walking and/or standing frequently even though weight is negligible. May include pushing and/or pulling of arm and/or leg controls while sitting most of the time.

*Id.* Dr. Adamson signed the letter, confirming that Plaintiff could perform light work, subject to the caveat that "[t]here is concern he will not be able to use foot pedal effectively. **He may work light duty if it does not involve flying**." *Id.* (emphasis added).

On July 25, 2014, Defendant denied Plaintiff's LTD benefit claim, asserting that "[t]he medical information does not support your inability to perform the material duties of your own occupation based on the information currently noting no evidence of neuromotor loss of the lower extremities in particular the lower leg, ankle, foot that would result in ongoing functional loss of the right foot. Record (AR 7000166).

On November 14, 2014, Plaintiff appealed Defendant's decision in the form of a letter and supporting correspondence from Dr. Adamson, Dr. Welshofer, and Dr. Allen Edwards, Plaintiff's Aviation Medical Examiner. *Id.* at AR7000212-7000218. Plaintiff's narrative states that, after his leg began collapsing at random times, he realized that "if [his] leg were to give out as it has and continues to do, that could result in injury to me and/or passengers ranging from minor to fatal." He states that as soon as he began experiencing this symptom, he contacted Netjets and Dr. Adamson.

The attached letter from Dr. Adamson states the following:

Larry Cline is currently under my care.

Mr. Cline was seen in my office on 9/18/14. At this point now, two years after his decompression with adequate decompression confirmed on post-op imaging, I do not think that there is any option we have to make this any better and suspect that this is going to be a permanent situation for him. He will return to see me on an as-needed basis.

*Id.* at AR 7000215. The note attached to Plaintiff's letter from Dr. Welshofer states in pertinent part the following:

Dr. Lesher had suggested that the patient's symptoms could be due to S1 nerve root radicular symptoms but, like myself, he found no specific radiculopathy. I had discussed this with the patient at the time of his electrodiagnostic evaluation, I do not remember the specifics of the conversation, but in all likelihood my explanation to him was that the nerve can get irritated causing symptoms like what the described. Much akin to the occasional trippage of a circuit breaker. This discussion was mainly to generate an analogy for the patient to help explain the overall symptom complex. There is no evidence of ongoing nerve root damage.

*Id.* at AR 7000216. The attached letter from Dr. Edwards states in pertinent part the following:

At the time of his aviation medical examination on 9/23/2013, [Plaintiff] appeared to be doing well, but subsequent to this, he experienced episodes of leg "collapsing," causing him to stumble and almost fall.

His physicians have done an extensive evaluation that has not adequately explained the giving way of his leg. He has undergone physical therapy, where he gained essentially normal strength in the right leg, but he continues to have the leg giving

way, reportedly several times a day. Mr. Cline is concerned that this problem could cause a significant safety issue in the event of an emergency situation when performing his airman's duties.

I examined Mr. Cline on 8/8/14. I did not detect any problem with the knee (e.g. evidence of torn meniscus or instability) that might explain the giving way of the leg. I had him perform lunges, and with the second lunge with the right leg, he nearly fell when the leg failed to hold him up. Based upon my observation, I am certain that his leg's giving way is real and is not a feigned symptom.

While the objective testing that has been done thus far has failed to document a measureable cause of his symptoms, it is my opinion that the giving way of Mr. Cline's leg is likely due to neurologic dysfunction related to his previous herniated disk or the aftermath of his surgery.

(AR 7000218).

In response to Plaintiff's appeal, Defendant obtained a "physician review", conducted by Dr. David McKenas on December 29, 2014. *Id.* at AR 7000206-7000210. As part of the review, Dr. McKenas phoned Dr. Edwards, Plaintiff's Aviation Medical Examiner *Id.* at AR 7000208. Dr. McKenas reported about the conversation that Dr. Edwards discussed the knee issue with the regional flight surgeon, who "… felt also he should be cleared." (AR 7000208).  Dr. McKenas also reported from the conversation that "Orthopedics also cleared the knee." *Id.* Dr. McKenas apparently recalled further from the phone conversation with Dr. Edwards that: "The did his Class I physical in August [2014] and he passed."  *Id.* However, it appears that Dr. Edwards had last performed a complete aviation medical examination on Plaintiff on September 23, 2013. (AR 7000218 and AR 7000185).  Dr. McKenas declares, "[w]e therefore share the view that given the FAA feels he is safe to fly; he is cleared to flight duty with no restrictions." (AR 7000208). Dr. McKenas concludes further that "[t]here is no objective pathology to explain the knee give-way symptoms." (AR 7000209).

On January 23, 2015, Defendant reaffirmed its original decision on initial appeal. *Id.* at AR 7000178-7000180. In its notification letter, Defendant states, "[o]ur review has found that you are concerned with resuming flight status due to your subjective complaints that your leg gives out. However, all testing completed by your treating physician has been essentially negative, and therefore, provides no evidence of a functional deficit that would cause a true impairment." *Id.* at AR 7000179-7000180.

On June 1, 2015, Plaintiff, now counseled, sent via his attorney a request for reconsideration to Defendant, asking that Defendant reevaluate its decision. Counsel asserted that Defendant's decision was based on inaccurate information, particularly Dr. McKenas's belief that Plaintiff had passed a new FAA physical in August 2014. *Id.* at AR7000183. Counsel for Plaintiff attached letters from Dr. Edwards, MD and Dr. Daniel Senft, DO, Lincoln Family Practice, Plaintiff's referring doctor, to the request for reconsideration. *Id.* at AR 7000185-700186.

In his letter of April 21, 2015, which Plaintiff presented with his request for reconsideration and which was written after Dr. McKenas's physician review letter, Dr. Edwards documented his findings as follows:

> I am Mr. Cline's aviation Medical Examiner. I last performed a complete aviation medical exam on Mr. Cline on 9/23/2013, about 16 months after he had lumbar disc surgery. At that time, I detected no neurologic deficits other than loss of his left ankle reflex.

> Subsequent to this, on 8/8/2014, Mr. Cline reported to me that he was experiencing unpredictable episodes of his right leg suddenly giving way. I reviewed medical records from his treating physicians and performed a focused exam during which the leg did, indeed, give way, causing him to stumble and almost fall.

> I discussed this situation with my Regional Flight Surgeon and reported my findings to the FAA. After their review, they decided he was still medically qualified for a First Class medical certificate.

> Mr. Cline reports he has continued to have the episodes of the leg giving way and has expressed his concerns that this problem was not consistent with the job

demands of his particular job. I have reviewed his job description, and, in my opinion, while he is medically qualified to operate an aircraft, he could not safely and reliably perform some of the essential functions listed.

Specific tasks that I would not consider him able to perform safely include:

1. "climbing on wings"
2. "run while carrying or pulling suitcase, kitbags, etc."
3. "yaw (leg) control expecting 150 lbs. of force"
4. "Bending the body downward and forward by bending leg and spine."

(AR 7000185).

Defendant's counsel also included in his submission a letter of March 31, 2015 from Dr. Senft, which states, "Mr. Larry Cline is currently under my medical care. . . . In my medical opinion, I feel [Plaintiff] is unsafe to fly commercial or private aircraft. This is due to my military background as a flight surgeon in the United States Army." (AR 7000186).

Pursuant to Plaintiff's request for reconsideration based on alleged factual error, Defendant conducted a second review of the file, and on June 17, 2015, again upheld its original decision. *Id.* at AR 7000182. (See also Defendant's brief referring to the second review of the initial denial (Doc. 11-1, pg. 8). In its notification letter to Plaintiff, Defendant states in pertinent part the following:

All examination findings provided by his providers for our review, did not find any specific deficits in Mr. Cline. . . . We understand that Dr. Edwards's letter provides his opinion that Mr. Cline would be unable to perform several specific tasks. However, there was no medical evidence provided to support that opinion. In addition, Dr. Edwards confirms that Mr. Cline was medically qualified for a First Class medical certificate from the FAA. We have also reviewed the opinion of Dr. Senft; however, again no medical evidence was submitted to support that opinion. The evidence submitted for our review did not support any significant impairment that would preclude Mr. Cline from performing his own occupation. In review of this new information, we find no indication that records previously received and reviewed provided inaccurate information. We regret that we were unable to make a favorable decision for your client. . . . Since we've made our final decision, no other action will be taken by us.

(AR 7000182). As result, Plaintiff exhausted his administrative remedies, and the claim is ripe for judicial review pursuant to 29 U.S.C. § 1132.

## IV.    STANDARD OF REVIEW

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to support or oppose a summary judgment motion, a party is required to cite to "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials;" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); accord. Anderson v. Liberty Lobby, 477 U.S. 242 (1986) (applying former version of Rule 56); Celotex Corp. v. Catrett, 477 U.S. 317 (1986) (same).

It is well-established that the mere existence of "some" factual disputes will not defeat summary judgment; rather, the dispute presented must be "genuine" and concern "material" facts. Anderson, 477 U.S. at 247-248 (emphasis in original); see also Emmett v. Johnson, 532 F.3d 291, 297 (4th Cir. 2008). Only disputes over facts that might affect the outcome of the suit under relevant governing law fall within the relevant category. See Fields v. Verizon Servs. Corp., 493 Fed. App'x 371, 374 (4th Cir. 2012). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248.

Abstract or conjectural doubts, minor discrepancies, and points irrelevant to the "material" facts are not genuine or material, and such do not cast sufficient doubt on the validity of testimony

to preclude the entry of summary judgment. *Emmett*, 532 F.3d at 297; *Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006). The non-movant cannot demonstrate a triable issue of disputed fact by building one inference upon another. *Emmett*, 532 F.3d at 297 (citing *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)). Although it is certainly true that "the facts and all reasonable inferences must be viewed in the light most favorable to the non-moving party," *Smith v. Va. Commonwealth Univ.*, 84 F.3d 672, 675 (4th Cir. 1996) (en banc), it is equally true that a court is "well within its discretion in refusing to ferret out the facts that counsel has not bothered to excavate." *Cray Commc'ns. Inc. v. Novatel Computer Sys., Inc.*, 33 F.3d 390, 396 (4th Cir. 1994). Mere conjecture and speculation, however, are insufficient to overcome a summary judgment motion. *See Autry v. North Carolina Dep't of Human Resources*, 820 F.2d 1384, 1386 (4th Cir. 1987); *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 241-46 (4th Cir. 1982); *accord Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999).

The ERISA statute does not specify the appropriate standard of review for actions challenging benefit eligibility determination actions under 29 U.S.C. § 1132(a)(1)(B). *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109. Depending on the language of the insurance plan at issue, a plan administrator's disability benefit determination can be reviewed either de novo or for abuse of discretion. *Id.* at 115. If a plan "confers discretion on a fiduciary and the fiduciary acts within the scope of conferred discretion, [courts] defer to the fiduciary in accordance with well-settled principles of trust law . . . ." *Booth v. Wal-Mart Stores, Inc. Assoc. Health & Welfare Plan*, 201 F.3d 335, 341 (4th Cir. 2000) (citing *Firestone*, 489 U.S. at 111). In this instance, it appears that the Plan gives discretionary authority to Defendant and Defendant acted within the scope of the Plan. The Plan states that "Aetna is a fiduciary," and "has complete authority to review all denied claims for benefits under this policy." [Doc. 10-6] at 31. Additionally, the Plan states that

12

"Defendant has the discretionary authority to: determine whether and to what extent employees and beneficiaries are entitled to benefits; and construe any disputed or doubtful terms of this policy." *Id.* There are no allegations that Defendant acted outside the scope of its discretion. Therefore, Defendant's decision to deny Plaintiff's LTD benefit claim will be reviewed for abuse of discretion.

Under the abuse of discretion standard, an administrator's decision must be reasonable. *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 787 (4th Cir. 1995). The Forth Circuit has held that a plan administrator's decision is reasonable if it is "the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997). Under an abuse of discretion standard, Defendant's decision should not be disturbed if it is reasonable. *Id.* Even if the Court were independently to come to a different conclusion, the Court will not reverse the plan administrator's decision if it is reasonable. *Booth*, 201 F.3d at 344. The Fourth Circuit has identified the following eight nonexclusive factors (known as the *Booth* factors) that a court may consider in determining if an administrator's decision is reasonable:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Id.* at 342–343. In applying the *Booth* factors, the court does not weigh the evidence in the administrative record but, rather, reviews it to confirm that the claim decision was the product of a principled, reasoned decision-making process supported by substantial evidence. *Williams v. Metropolitan Life Ins. Co.*, 609 F.3d 622 (4th Cir. 2010). If the Court were so to find, Defendant's adverse claim decision will be upheld. If otherwise, it will be overturned.

## V.    CLAIM PRESENTED AND ANALYSIS

Plaintiff claims Defendant wrongfully denied Plaintiff's claim for LTD benefits in violation of Plan provisions and ERISA. [Doc. 1] at 4. Plaintiff states that he is disabled and unable to perform the material duties of his occupation; that Defendant did not give proper weight to the evidence in the administrative record that he is disabled; that Defendant's interpretation of the definition of disability is contrary to the plain language of the Policy and is unreasonable; that Defendant's claim resolution process is flawed as applied; and that Defendant violated its contractual obligations under the Plan. *Id.* In his brief in support of Plaintiff's Motion and his response in opposition to Defendant's Motion, Plaintiff argues that Defendant's denial of his claim for LTD benefits was not the result of a deliberate, principled reasoning process, and that it was not supported by substantial evidence. [Doc. 9]; [Doc.12]. Additionally, Plaintiff argues that Defendant abused its discretion in concluding that Plaintiff was not disabled from his own occupation. *Id.* Defendant opposes Plaintiff's arguments, and in its brief in support of Defendant's Motion, recites the administrative record, arguing that its decision to deny Plaintiff's claim for LTD benefits was supported by substantial evidence and that it did not abuse its discretion. [Doc. 11-1].

The Plan offers disability payments for two situations, one where claimant is disabled from performing his own occupation and the other where claimant is disabled from any occupation. This case involves only the former arrangement, potentially providing benefits for 24 months after a 180 day elimination period. The criteria for an "own occupation" analysis put the focus on the material duties of the job in question.  The plan in this case thus notably applies only with respect to the specific circumstances of the claimant's own occupation.

The duties and requirements for performance of this job are laid out in detail as set forth in the Statement of Facts above. Although the plan calls for the relevant duties to embody only those for pilots as performed in the national economy rather than those of the particular employment relationship involved in the claim, Defendant has not taken issue with the NetJets listed duties, nor provided the Court with contrasting duties that might be standard in the national economy. Moreover, Mr. Cline's doctors evaluated his condition with a view toward his ability to perform in his own occupation, as indicated by their letters and reports. Thus, the Court considers the explicit NetJets criteria as the ones relevant to the current inquiry.

The evidence *in toto* included Plaintiff's patient history, his claim and appeal letters, medical reports, and the "physician review" of Defendant's consultant, Doctor McKenas.

The Court's responsibility here entails an examination of the job specifics laid over against the medical findings and other evidence produced to determine if the decision of the Defendant and its claim resolution process as shown by the administrative record was sound in the light of the *Booth* factors.

The Court concludes that Defendant's decision was not reasonable in that it was not the product of a reasoned and principled process, was not supported by substantial evidence, was undermined by the inherent conflict of interest existing within Defendant, and constituted an abuse of discretion.

The Court finds that Defendant's process and decision fall short of the relevant standards and holds that Defendant's denial must be overturned and the Plan benefits awarded to Plaintiff.

**A. Defendant's decision-making process was not reasoned and principled and relied on materials inadequate to constitute substantial evidence in support of its decision.**

The primary fallacy in Defendant's analysis in this case stems from its failure to account for the subjective evidence of Plaintiff's impairments and the insistence on limiting its assessment of his condition to "objective" evidence, specifically the results of two tests, a nerve conduction study and an ultrasound.

In Defendant's summary of its decision process in turning down the request for reconsideration Defendant repeated its position that "no evidence" or no "medical evidence" or "no specific deficits" had been presented to support a finding of disability.

Beginning with subjective evidence, one notes that the record is replete with Plaintiff's consistent accounts of his experience of symptoms incompatible with an ability to perform the physical requirements of his job. This evidence may be termed subjective in nature. It forms the personal basis of his claims to Defendant and his history as provided to doctors to facilitate his diagnosis and treatment. The law is clear in endorsing such evidence as fully probative of disability in a proper case.

Subjective evidence is not only relevant, but may be sufficient in itself to support the claim. It tends to show that his right leg intermittently collapses, and that this condition disqualifies him from safely piloting a plane. *See DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 873 (4th Cir. 2011) (noting that plaintiff, who had fibromyalgia, "produced the only types of evidence a claimant in her situation could produce, her own description of the severity of her subjective symptoms, videos showing how she moved in her condition, and her treating physicians' opinions that the pain and fatigue rendered her unable to work. As the Policy contained no provision precluding [plaintiff] from relying on her subjective complaints as part of her evidence of disability, [defendant] could not reasonably deny her claim because of such

reliance.")[3] Similarly, in *Cosey v. Prudential Ins. Co. of Am.*, the court held that "the district court erred in concluding that [the administrator] could deny [claimant's] STD and LTD claims on the basis that her proof lacked such objective evidence." 735 F.3d 161, 171 (4th Cir. 2013).

To discount such evidence as Defendant does demonstrates an errant process. The failure to lend weight to the subjective evidence or explain its role in Defendant's decision led to an unreasonable decision to deny benefits.

Moreover, the medical evidence existing alongside the raw testing evidence received scant attention in Defendant's analysis. Defendant relies heavily on the facts that an EMG nerve conduction study and an ultrasound test were essentially negative. Yet the reports of the very doctors conducting those tests-Drs. Welshofer and Lesher-found explanatory factors underlying Plaintiff's symptoms as noted in the statement of facts. Dr. Welshofer: the S1 nerve root "can get irritated" and act as in the case of "a circuit breaker" tripping. Dr. Lesher: "I think Larry's symptoms are related to chronic radiculitis given his sensory involvement affecting the lateral aspect of his foot and diminished right Achilles reflex." (AR 7000223). In addition, Defendant's preoccupation with cause is off point. While the precise <u>cause</u> is relevant to a discussion of an impairment, the practical <u>effects</u> on ability to perform certain specified duties controls under the Plan. Examples of effects are Plaintiff's doctors keeping Plaintiff out of work and the safety concerns of his treating doctors as related to specific functions of Plaintiff's occupation.

Subsequent to his decompression surgery for lumbar stenosis, Plaintiff's reports to his doctors, and to Defendant as part of the claim process, unwaveringly recounted the ongoing effects of his right leg condition, namely its propensity intermittently to give way, or buckle, such as to

---

[3] In like manner, the Plan contains no restriction on use of subjective evidence to support a claim.

undermine a reasonable level of confidence in his ability to perform the several identified essential requirements of his job, as set forth in NetJet's specifications. Moreover, his credibility in relating his experience has not been expressly attacked, most notably not by his examining and treating physicians, nor Defendant's counsel, nor Defendant in its denial of the claim. In support of Plaintiff's claim for LTD benefits, he submitted numerous reports and letters from his treating physicians, who point out that while objective testing hasn't pinpointed a measurable cause of Plaintiff's right leg collapsing, it is not a feigned symptom. Dr. Edwards declared that "the giving way of Mr. Cline's leg is likely due to neurologic dysfunction related to his previous herniated disk or the aftermath of his surgery." AR 7000218 at 54.

Plaintiff pursued diagnosis and treatment in a diligent and good faith effort to overcome his symptoms, undergoing a successful physical therapy regimen to strengthen his leg. (AR 7000275). But the symptoms continued, along with their consequent debilitating results for reliable performance of his job duties.

Defendant's appeal specialist, Ms. Dorman, took the negative aspect of those two specific tests as determinative, dismissing the subjective but medically probative basis for undertaking the tests and for the treating doctors' opinions, which lend support to Plaintiff's claim. They kept Plaintiff out of work and continued efforts to remediate his deficits. Defendant's narrow focus on the evidence reveals the superficial nature of Defendant's claim analysis.

This tunnel vision defect may be seen also in the lack of consideration given to the issue of safety as it relates to the duties of a pilot such as Plaintiff. The question of safety in itself naturally arises in the context of the medical condition of a pilot. Moreover, the Plan of insurance directs one to take account of the duties and responsibilities of an insured pilot, which self-evidently spring from and implicate consideration of the safety of a plane in flight. Yet Defendant's

decision documents denying the claim for disability insurance benefits barely discuss that component of the evidence beyond mere mention of it, and fail to explain its role in Defendant's denial of the claim.

In making its initial decision, Defendant had not sought medical review of Plaintiff's medical records. In upholding that decision on Plaintiff's appeal, Defendant relies mainly on Dr. McKenas's physician review, specifically his assertions that the Plaintiff lacked objective evidence, passed a Class I physical in August 2014 and was cleared by FAA authorities to flight status without restrictions. [Doc. 10-2] at 14–16. Here, the asserted lack of positive objective testing evidence stands in stark contrast to the reports and letters from Plaintiff's treating physicians. For example, Dr. Edwards reports that, "[w]hile the objective testing that has been done thus far has failed to document a measureable cause of his symptoms, it is [his] opinion that the giving way of Mr. Cline's leg is likely due to neurologic dysfunction related to his previous herniated disk or the aftermath of his surgery." (AR 7000218). Defendant makes no effort to challenge Dr. Edwards' medical opinion other than reiterating its reliance on the record review of Dr. McKenas.

While the Court does not re-weigh the evidence in its task to examine Defendant's decision for abuse of discretion, it must nevertheless give due consideration to the third enumerated *Booth* factor, which calls attention to:

> (3) the adequacy of the materials considered to make the decision and the degree to which they support it;

Dr. McKenas' gave his written opinion after a review of Plaintiff's medical record and without an in-person medical examination. In this report Dr. McKenas states that his rationale to support a finding of non-disability is based on his analysis from both the clinical and FAA perspective, thereby seeming to elevate the latter to an equal plane with clinical findings. The

Court finds this emphasis to be misplaced, but still the role of the "FAA perspective" in Defendant's decision bears close examination.

First the Court looks to language of the Plan itself for a relevant indication of the place an FAA stance or certificate, if any, might properly hold in Defendant's claim decision.

The Plan provides: "If your **own occupation** requires a professional or occupational license or certification of any kind, you will not be deemed to be disabled solely because of the loss of that certification."[4] (AR 7010004). Thus, the Plan makes clear that non-issuance of any occupational certificate is not to be taken as decisive in itself. It follows that <u>issuance</u> of a certificate alone could likewise not be taken as determinative, but only as one factor in the disability decision. One may infer that the reason for this limitation on the probative value of "certificate" evidence is that the criteria used by the issuing authority for its decision may very well be different from those used to determine disability as such under a given plan of insurance.[5]

The Plaintiff takes issue with Defendant's reliance (in its first appeal decision and in its final decision) on Dr. McKenas' report in respect of his conclusions concerning the FAA aspects of the evidence. Thus, the Court must assess the relevance and import of communication which took place between Dr. Edwards and Federal Aviation Administration ("FAA") officials and a subsequent related telephone conversation between Dr. Edwards and Dr. McKenas on December 29, 2014. This latter phone call appears to be the sole source of Dr. McKenas's knowledge of the FAA position regarding Mr. Cline. Moreover, Dr. McKenas, for his part, laid great emphasis on this phone call, as thereafter he terminated his efforts to contact Dr. Adamson as part of his "peer

---

[4] The question of an FAA certificate, whether issued or not, may be considered under the rubric of the seventh *Booth* factor: "any external standard relevant to the exercise of discretion."

[5] This discussion pointing to the nature of the Plan implicates the second *Booth* factor-the purposes and goals of the Plan.

to peer consultation", declaring that; "after the call with Dr. Edwards, no further questions remain to be posed for this review." (AR 7000208).

Plaintiff contends that Dr. McKenas misunderstood or mischaracterized what he learned from Dr. Edwards, resulting in a flawed report to Defendant. For its part, Defendant relies considerably and explicitly on Dr. McKenas's representations as to the purported FAA perspective on Plaintiff's condition.

In assessing Dr. McKenas's account of the phone call, the Court considers his statement that "They did his class I physical in August [2015] and he passed." (AR 7000208). The Court concludes that this statement is inaccurate and unsupported by the record. No clinical notes or other record of a Class I physical or resulting actual certificate of any kind have been presented to the Court, and the statement is directly contradicted by Dr. Edwards's subsequent letter of April 21, 2015 (AR 7000185), indicating that the last such complete exam occurred on September 23, 2013.

The Court next turns to the question of whether Plaintiff would have been <u>eligible</u> for a first class certificate under FAA auspices during the period of coverage. Drs. Edwards and Mckenas corroborate one another with respect to Dr. Edwards's confirmation that Plaintiff was still medically qualified for a first class medical certificate. However, in the absence of actual issuance of such a certificate, as is the case here, it must remain a matter of pure speculation whether it would have contained restrictions consistent with Dr. Edwards's limitations outlined in his letter of April 21, 2015. Dr. Edwards, as regional aviation medical examiner, would have been the source of medical opinion underlying any such certificate. Thus, Dr. McKenas's further statement that: "We therefore share the view that given the FAA feels he is safe to fly; he is cleared

to flight duty with no restrictions," is also speculative and unsupported by the record.[6] Moreover, Dr. Edwards credibly resolved the question of differences in the criteria for a medical certificate versus the Plan's criteria for disability insurance, when he stated: "I have reviewed the job description, and in my opinion, while he is medically qualified to operate an aircraft, he could not safely and reliably perform some of the essential functions listed" and went on to list those function as follows:

> Specific tasks that I would not consider him able to perform safely include:
>
> 5. "climbing on wings"
> 6. "run while carrying or pulling suitcase, kitbags, etc."
> 7. "yaw (leg) control expecting 150 lbs. of force"
> 8. "Bending the body downward and forward by bending leg and spine."

(AR 7000185).

The most authoritative, specific and substantial evidence before Defendant on the appeal and the reconsideration request, as to Defendant's medical condition and its relationship to the material duties of his own occupation, comes from that letter of April 21, 2015, from Dr. Edwards himself. Dr. McKenas did not have the benefit of this letter in preparing his physician review because it was written and came into evidence subsequent to that review. Likewise, he did not have Dr. Senft's letter of March 21, 2015, confirming his opinion as treating and referring physician and due to his background as a flight surgeon in the United States Army, that Plaintiff is "unsafe to fly commercial or private aircraft." (AR 7000186). But Defendant did have such

---

[6] Dr. McKenas also reports from his single phone call with Dr. Edwards that "Dr. Edwards noted that orthopedics also cleared the knee." (AR 7000208). This statement is not acknowledged by Dr. Edwards and, although citing it, Defendant notes in its appeal denial that "…we do not have records of that evaluation." (AR 7000179). Indeed, no such records or other items showing context, have been presented to the Court or, for that matter, to Defendant to support its decision process. Consequently, whether the statement, if made, was supported by an actual examination, or was merely the result of a telephone contact or other activity cannot be determined by the Court.

benefit and nonetheless concluded that there was "no evidence" of Defendant's inability reliably to perform in his own occupation.

The only evidence to the contrary of Dr. Edwards's report and those of the other doctors is that of Dr. McKenas, whose report, while independent, is ostensibly derivative of the findings of Plaintiff's doctors. The latter, however, uniformly reveal no doubts of Plaintiff's credibility concerning his symptoms, found a medical basis for them and concluded he could not be expected to perform the necessary material functions of his own occupation in the light of those symptoms.

This certainly constitutes evidence of an objective functional deficit in Plaintiff's leg and is far from "no evidence". Defendant's reliance on Dr. McKenas's report is not supported by the record.

As indicated earlier in this opinion, the entire place of occupational licensure or medical certification, and the FAA posture, such as it may have been, is overblown.[7] To keep one's eye on the ball in this case is to focus on the language of the Plan, and what it means for Plaintiff's medically ascertained inability to perform certain material particulars of his own occupation. The Defendant failed to keep that focus.

For the foregoing reasons, and considering the record as a whole, Defendant's adverse disability determination is not supported by substantial evidence, is not the result of a reasoned and principled process, and constituted an abuse of discretion.

## B. Defendant had a significant conflict of interest

The eighth enumerated *Booth* factor concerns whether a conflict of interest existed. In this case, Defendant served as both the insurer and the administrator of the Plan. Defendant was

---

[7] Given the Court's holdings, the FAA statutory and regulatory specifics, which the parties have taken pains to present in their briefs, are beside the point.

responsible for deciding whether benefits should be paid and for paying those benefits, and serving in both of these roles creates a structural conflict of interest. *Williams*, 609 F.3d at 632. "Conflicts are but one factor among many that a reviewing judge must take into account," but this conflict of interest can be of great importance "where circumstances suggest a higher likelihood that it affected the benefits decision . . . ." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 116–117 (2008). Structural conflicts of interest do not always merit significant weight. For example, in *Williams*, the Fourth Circuit noted that structural conflicts of interest should not receive significant weight where the plan administrator initially found a disability and paid LTD benefits. 609 F.3d at 632. Here, Defendant is both the insurer and administrator of the Plan, and this fact, when coupled with Defendant's narrow focus on the evidence and its excessive reliance on the opinion of Dr. McKenas, weighs toward Plaintiff in the Court's review for reasonableness and abuse of discretion.

The decision making process is judged on the manner in which Defendant takes the medical evidence as a whole into account or fails to do so. The process may be found wanting and the conclusion may fall short on the standard of reasonableness where it is not sound in the light of the evidence as applied to the contractual specifications for disability as found in the Plan language. The first enumerated *Booth* factor is: "the language of the Plan." Here, given the medical evidence in its entirety, Plaintiff's ability to perform his occupational requisites as a pilot are substantially compromised. The evidence to the contrary proved to be insubstantial. The third enumerated *Booth* factor comes strongly into play here in favor of Plaintiff's position- "… the adequacy of the materials considered to make the decision and the degree to which they support it…." Thus, the Defendant's decision to deny coverage failed to take the overall weight of substantial evidence into account as part of a reasoned process.

## VI.    REMEDY

Finally, the Court must decide whether to remand to the administrator or directly grant benefits. *DuPerry*, 632 F.3d at 875; *Fisher v. Aetna Life Ins. Co.*, 890 F. Supp. 2d 473, 485–486 (D. Del. 2012). In the Complaint and Plaintiff's Motion, Plaintiff requests an award of all retroactive benefits due to him, prejudgment interest, and attorney's fees and costs pursuant to 29 U.S.C. § 1132(g). [Doc. 1] at 4–5; [Doc. 8] at 1.

Remand is often appropriate when a plan administrator's decision is overturned. *See Helton v. AT&T Inc.*, 709 F.3d 343, 360 (4th Cir. 2013); *Bernstein*, 70 F.3d at 788; *Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.*, 32 F.3d 120, 125 (4th Cir. 1994). "However, remand is not required, particularly in cases in which evidence shows that the administrator abused its discretion." *Helton*, 709 F.3d at 360; Furthermore, an order awarding benefits is appropriate where the evidence in the record clearly shows that Plaintiff is entitled to benefits. *Gorski v. ITT Long Term Disability Plan for Salaried Emps.* 314 Fed. App'x 540, 548 (4th Cir. 2008). *see also Miller v. United Welfare Fund*, 72 F.3d 1066, 1075 (2d Cir. 1995) (Calabresi, J., concurring in part, dissenting in part) ("[W]hen the trustees have demonstrated a manifest unwillingness to give fair consideration to evidence that supports the claimant, the claim should not be returned to the trustees.")

The Court finds that Defendant has demonstrated a manifest unwillingness to give fair consideration to Plaintiff's evidence in the record, which shows that claimant is entitled to benefits. The record includes reports and letters from Plaintiff and his treating physicians, who document Plaintiff's condition and urge that it is unsafe for Plaintiff to pilot an airplane, a condition of his employment. Despite this evidence, Defendant relies predominantly on Dr. McKenas's flawed report. The Court finds it an unreasonable abuse of discretion to disregard Plaintiff's treating

physicians' recommendations. Defendant's reluctance to reassess Dr. McKenas's report after Plaintiff pointed out that certain underlying facts were incorrect, is an indicator of Defendant's unwillingness to give fair consideration to Plaintiff's evidence. Accordingly, the Court finds it appropriate to order that Defendant retroactively award Plaintiff's LTD benefits.

The Parties are ordered to confer with one another within 30 days of the date this order is filed for the purpose of reaching an agreement as to the details of Plaintiff's recovery, given the Court's decision on the merits of this matter, to permit the Court to enter a judgment reflecting the proper amount due, inclusive of prejudgment interest, attorneys' fees, and costs. In the event the parties are unable to reach an agreement, they shall submit supplemental briefing, per the instructions below, detailing the amount due to Plaintiff.

Regarding Plaintiff's request for prejudgment interest, the Court notes that because ERISA does not explicitly provide for prejudgment interest, it is left to the discretion of the trial court. *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1030 (4th Cir. 1993). "The essential rationale for awarding prejudgment interest is to ensure that an injured party is fully compensated for its loss." *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 195 (1995). "[T]he governing principle is one of fairness." *Mary Helen Coal Corp. v. Hudson*, 235 F.3d 207, 211 (4th Cir. 2000) (internal quotation and citation omitted). In determining the appropriate prejudgment interest rate, a district court does not abuse its discretion in looking to the state statutory interest rate. *Quesinberry*, 987 F.2d at 1031. In North Carolina, that rate is eight (8) percent. N.C. Gen. Stat. § 24-1 (2016). Plaintiff has been deprived of LTD benefits due to him since nominally May 5, 2014, subject to any elimination period. Principles of fairness govern that Plaintiff be compensated for the "loss of the use" of those funds. *Quesinberry*, 987 F.2d at 1030. The Court finds it proper to use North Carolina's statutory interest rate of eight (8) percent.

Accordingly, Defendant is ordered to pay eight (8) percent prejudgment interest, calculated simply, for past-due LTD payments.

The parties will include in the aforementioned agreement (as to the recovery amount) considerations for the proper calculation of prejudgment interest.

ERISA provides for the discretionary award of attorneys' fees and costs of action to parties who have "some degree of success on the merits." 29 U.S.C. § 1132(g)(1); *Hardt v. Reliance Std. Life Ins. Co.*, 560 U.S. 242, 244 (2010) (quoting *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 694 (1983)). In the Fourth Circuit, if a party meets the initial burden of "some degree of success on the merits," its claims for attorneys' fees under ERISA are governed by the following five-factor test:

> (1) degree of opposing parties' culpability or bad faith;
> (2) ability of opposing parties to satisfy an award of attorneys' fees;
> (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances;
> (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and
> (5) the relative merits of the parties' positions.

*Williams*, 609 F.3d at 635 (quoting *Quesinberry*, 987 F.2d at 1029). "The five factor approach is not a rigid test, but rather provides general guidelines for the district court in determining whether to grant a request for attorneys' fees." *Quesinberry*, 987 F.2d at 1029 (citations omitted).

Every factor weighs in favor of Plaintiff being awarded attorneys' fees except the fourth factor. Defendant unreasonably relied on a flawed report to uphold its decision to deny Plaintiff's claim for LTD benefits. The unprincipled nature of Defendant's decision-making was enhanced by the conflict of interest created by Defendant's role as both insurer and administrator of the Plan. The Court believes Defendant has the ability to satisfy an award of attorneys' fees, and that an award of attorneys' fees here may deter Defendant and other plan administrators from improperly relying on an independent review instead of the medical reports of a claimant's treating physicians.

The merits of Defendants' arguments also weigh in favor of Plaintiff. Despite Plaintiff pointing out the inaccuracies of Dr. McKenas' report, Defendant failed to further investigate the evidence. Meanwhile, Plaintiff's treating physicians wrote additional letters, confirming their belief that it is unsafe for Plaintiff to pilot an airplane.

In sum, the Court finds that Plaintiff is entitled to a retroactive award of his LTD benefits, prejudgment interest, and attorneys' fees and costs associated with this litigation. The parties shall file a joint pleading, or supplemental briefing, or both, as directed below, on all aspects of the subjects of amount of benefits, amount of prejudgment interest, and liability for and proposed amount, if any, of attorney's fees and costs.

## VII. DECRETAL:

**IT IS, THEREFORE, ORDRED THAT**

1. Plaintiff's Motion for Summary Judgment (Doc. 8) is **GRANTED**;

2. Defendant's Motion for Summary Judgment (Doc. 11) is **DENIED**;

3. Defendant shall retroactively award Plaintiff Long Term Disability benefits and pay any and all past-due benefits;

4. Plaintiff is entitled to prejudgment interest at the statutory rate of eight (8) percent;

5. Plaintiff is entitled to reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g); and

6. The parties shall submit a joint pleading within thirty (30) days from the entry of this order detailing any agreed dollar amount of past-due benefits, prejudgment interest, and attorneys' fees owed to Plaintiff. As to any aspects of the foregoing items on which the parties cannot agree within the joint

pleading, Plaintiff's brief on the same subject is due forty-five (45) days from the entry of this order, Defendant's response is due fourteen (14) days from the submission of Plaintiff's brief, and Plaintiff's reply is due seven (7) days from the submission of Defendant's response.

Signed: November 15, 2017

Richard L. Voorhees
United States District Judge